1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUTH STAIRS, | ) 1:10cv0132 DLB |
| | ) |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## BACKGROUND

Plaintiff Ruth Stairs ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed her application on May 18, 2007, alleging disability since October 1, 2004, due to migraine headaches and chronic pain in her neck and head. AR 110-117, 126-132. After her application was denied initially and on reconsideration, Plaintiff requested a hearing before

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1  an Administrative Law Judge ("ALJ").  AR 49-51, 56, 103.  ALJ James Berry held a hearing on

2  April 15, 2009, and issued a decision denying benefits on July 16, 2009.  AR 4-15, 16-48.  The

3  Appeals Council denied review on November 13, 2009.  AR 1-3.

4       Hearing Testimony

5       ALJ Berry held a hearing on April 15, 2009, in Fresno, California.  Plaintiff appeared

6  with her attorney, Jeffrey Milam.  Vocational expert ("VE") Judith Najarian also appeared and

7  testified.  AR 16.

8       Plaintiff testified that she was 63 years old at the time of the hearing.  AR 19.  She lives

9  with her husband, who works as an independent auto appraiser.  AR 20.  Plaintiff completed a

10  Master's degree in rehabilitation counseling, though she never worked in the field.  AR 20.

11  Plaintiff last worked 2 days a week, for a few hours, in 2006.  She was helping her husband by

12  posting receivables.  AR 21.  Plaintiff no longer performs this work because she was having too

13  much difficulty sitting because of low back and neck pain.  AR 22.  She explained that she was

14  standing and walking at work, and would sit down for about 30 minutes.  AR 24.  Plaintiff has

15  not worked full-time since 1989.  AR 22.

16       Plaintiff believed that she could not work because of neck and low back pain and

17  migraines.  Her neck pain is a constant, stabbing pain that worsens if she sits too long or

18  overdoes anything.  AR 25-26.  When she rests, she sits down with her feet up and watches

19  television.  Plaintiff estimated that she lays down for 1.5 hours out of 8 and sits 20 minutes, 3 or

20  4 times a day.  AR 26.  Her neck pain radiates into her head and right arm.  AR 27.

21       Plaintiff also testified that her back pain is a constant, stabbing and burning pain.  The

22  pain radiates into her right leg.  AR 26-27.

23       Plaintiff has migraines for 2 out of 3 days, which cause pain, nausea, dizziness and

24  fatigue.  AR 27.  The pain lasts 3 hours and she has to take her medication and lay down.  She

25  also has pain in her eyes from light and has to make sure that there are no bright lights in the

26  room.  The nausea causes vomiting about once a month.  AR 27-28.  If she's having a migraine

27  and tries to concentrate on something, it causes her eyes, head and neck to hurt.  AR 29.

28

Plaintiff thought that she could lift about 10 pounds and could walk for about 45 minutes. She could stand in one place for 5 minutes, but she could stand for 10 minutes if she could shift back and forth. Plaintiff could sit for about 20 minutes every hour. AR 30-32. Plaintiff thought that she could concentrate for 5 minutes at a time. AR 34. She dusts, cooks, does the dishes and washes and folds clothes. AR 37.

In a typical day, Plaintiff wakes up and reads for about 20 minutes and then makes breakfast. After her husband leaves for work, she washes the dishes and might go outside to throw the ball to her dog or water some plants. She makes something simple for lunch and then might watch television, read, take a walk, make a phone call or visit someone. When her husband comes home from work, he helps her make dinner and then they watch television together. Then she does the dishes, reads and goes to bed. AR 33-34. She constantly has to re-read what she's reading because she has difficulty remembering. AR 34.

For pain medication, Plaintiff takes Advil, Tylenol, Robaxin (a muscle relaxant) and Maxalt. She sometimes gets Botox injections in her neck to relax the muscles. Maxalt can help ease her out of a migraine if she takes it before the migraine gets too bad. AR 38. Plaintiff also receives acupuncture, which lessens the pain and helps with numbness and tingling in her legs. AR 39.

The VE testified that Plaintiff's past work was classified as manager, auto specialty. AR 40-41. This position is classified in the Dictionary of Occupational Titles as light. AR 41.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and experience. This person can lift and carry 10 pounds occasionally, up to 10 pounds frequently, stand and walk for 6 hours and sit for 6 hours with the option to change positions as needed. This person can occasionally reach above shoulder level and can occasionally balance, stoop, kneel, crouch and crawl. The VE testified that this person could perform Plaintiff's past work, as performed. She explained that even though the position was classified as light, Plaintiff testified that she did not lift over 10 pounds. AR43-44.

For the second hypothetical, the ALJ asked the VE to assume that this person could lift and carry 10 pounds, stand 2 to 3 hours maximum, walk 45 minutes maximum and sit for 3 hours

1   maximum.  This person could only perform concentrated viewing of objects for less than 2

2   minutes.  This person would need to lie down for 1 to 1.5 hours per day with her feet elevated

3   and could not drive at night.  The VE testified that this person could not perform Plaintiff's past

4   work or any other work in the national economy.  AR 44-45.

5   <u>Medical Record</u>

6   A bone density test performed on July 28, 2004, revealed bone mineral density in the

7   lumbar spine compatible with osteoporosis and bone mineral density in the left hip compatible

8   with osteopenia.  This increased her risk of fractures.  AR 208.

9   On November 23, 2004, Plaintiff underwent an x-ray of her lumbosacral spine.  The test

10  revealed prominent narrowing intervertebral disc space at L4-5 and sacralization at the right

11  transverse process L5.  AR 207.

12  Plaintiff returned to her treating physician, Don Yoshimura, M.D., on February 24, 2005,

13  and reported increased migraines over the past few weeks as well as increased neck and back

14  pain.  Plaintiff was taking Floricet and Maxalt and wanted to try Topamax.  AR 209.

15  On March 29, 2005, Etsehiwot Taye, M.D., reported that Plaintiff has degenerative

16  osteoarthritis and has tried "NSAID, analgesics, physical therapy with no relief."  Plaintiff did

17  not want an epidural and Dr. Taye requested acupuncture as the "next modality of pain

18  management."  AR 211.

19  Plaintiff saw Dr. Yoshimura on May 3, 2005, and complained of "lots of labile mood" as

20  she tapered of Paxil, which she tapered off "for ? reasons."  Plaintiff denied any clear side effects

21  but felt that her concentration and word finding was better without Paxil.  Plaintiff's headaches

22  are usually associated with stress and exhaustion, though they were better on Topamax.  Dr.

23  Yoshimura advised Plaintiff to restart Paxil.  AR 273.

24  A second bone density test performed on June 20, 2005, revealed osteoporosis in the

25  lumbar spine and osteopenia in the left hip.  AR 212.

26  On July 26, 2005, Plaintiff complained of back pain after she fell while trying to chase a

27  mouse.  AR 239.  Plaintiff was walking okay, straight leg raising was negative and

28

1   flexion/extension was full.  She had tenderness at L4-5.  AR 240.  X-rays of her lumbar spine

2   taken the same day showed no evidence of a compression fracture.  AR 213.

3          Also on July 26, 2005, Plaintiff returned to Dr. Yoshimura and complained of some

4   increase in her headaches.  She noted "lots of environmental precipitants with weather changes,

5   perfumes."  Her stressors were better on Paxil and she was sleeping well.  She was not having

6   any adverse effects from Topamax and Dr. Yoshimura increased her dose.  AR 272.

7          On October 20, 2005, Plaintiff had an injection of Botulinum Toxin in her facial nerve.

8   Plaintiff stopped taking Topamax "due to concerns RE mood changes, hair loss, ? effect on

9   bones."  Her headaches were "not any different off" Topamax.  AR 214.

10         Plaintiff received another set of injections on February 13, 2006, after reporting that she

11  did better after the first set of injections.  Plaintiff had full cervical range of motion with right

12  occiput trigger point.  He diagnosed chronic mixed headaches, increased after recent fall, with

13  some right occiput muscle strain.  AR 215.

14         On April 3, 2006, Plaintiff returned to Dr. Yoshimura and reported that she was having

15  near daily headaches requiring a lot of Maxalt.  She has not been on a prophylactic medication

16  since "stopping Topamax for ? reasons last year."  Dr. Yoshimura ordered Plaintiff to try

17  Depakote and to taper off Maxalt a little.  AR 219.

18         On April 7, 2006, Plaintiff saw Shashi Bains, M.D., for an initial visit.  She complained

19  of chronic pain and stated that she has had neck pain for over 30 years.  Plaintiff thought that her

20  neck pain was getting worse because of intermittent numbness in her hands.  She also

21  complained of pain in her back.  On examination, Plaintiff had reduced flexion of her neck but

22  full range of motion in her back.  There was no tenderness, palpable spasm or pain on motion.

23  Plaintiff's grip strength was normal.  Dr. Bains diagnosed chronic neck pain with some radicular

24  symptoms and ordered Plaintiff to continue with her current acupuncture regimen.  Dr. Bains

25  also diagnosed osteoporosis and low back pain and noted that a spine clinic evaluation would be

26  arranged.  AR 218.

27         An MRI of Plaintiff's cervical spine performed on April 28, 2006, revealed degenerative

28  changes.  Specifically, the scan showed (1) a 4.5mm posterolisthesis of C5 on C6; (2) at C3-4,

1  broad-based disc bulge/osteophyte that effaces the anterior epidural fat, as well as right neural

2  foraminal encroachment by osteophytic formation; (3) at C4-5, right neural foraminal

3  encroachment by osteophytic formation; (4) at C5-6, posterolisthesis of C5 on C6, as well as

4  broad-based osteophyte complex; (5) at C6-7, mild right neural foraminal encroachment by

5  osteophytic formation. AR 221. Dr. Bains characterized the MRI findings as showing "multiple

6  arthritic changes." AR 221.

7      Plaintiff had a third set of injections on May 8, 2006. She was taking Depakote and

8  reported some decrease in frequency and severity of her headaches. AR 216.

9      On June 13, 2006, Plaintiff saw Karl Quinn, M.D., for a spine consultation. She

10  complained of neck pain for the past 35 years, with an increase in pain over the last few years.

11  On examination, Dr. Quinn noted "Waddell Signs Generalization" and intermittent but intense

12  eye contact. Gait was normal, though she had a slight limp on the right side during heel walking.

13  Range of motion in her lower back produced pain on forward flexion and more pain on

14  extension. Range of motion in her neck was decreased with pain. Plaintiff had decreased deep

15  tendon reflexes in her left biceps and a slight sensory decrease bilaterally in her little finger. She

16  had slight tenderness to palpation of her neck. Dr. Quinn noted that the MRI showed no severe

17  central canal stenosis, though she had degenerative disc disease, some retrolisthesis and some

18  narrowing on the right. The upper/mid vertebral bodies had wear "a bit greater" than expected

19  for her age. AR 263. Dr. Quinn diagnosed chronic axial neck pain with a history of severe

20  migraines. He advised against surgery and asked Plaintiff to continue with acupuncture, yoga

21  and meditation. Her low back pain has improved dramatically with acupuncture and if her neck

22  pain did not improve, he will discuss the chronic pain program. He thought Plaintiff might

23  benefit from the multidisciplinary approach. AR 264.

24      On August 8, 2006, Plaintiff saw Dr. Yoshimura and reported that she did better after her

25  May 2006 injection. She was not taking Depakote due to weight gain and GI upset. Plaintiff

26  was taking Topamax, but wanted to stop due to diarrhea. She never started Neurontin. Plaintiff

27  received an injection and was instructed to start Neurontin. AR 261.

28

1  From August 2006 through approximately September 2007, Plaintiff received

2  acupuncture treatments and often reported improvement.  AR 253, 257, 306, 311, 314, 337.

3  Plaintiff returned to Dr. Yoshimura on October 31, 2006.  Plaintiff did better after her

4  August 2006 Myobloc injections.  She was off all medications except for Paxil and Soma.

5  Cervical range of motion was full and strength, bulk and gait were okay.  Plaintiff received

6  another Myobloc injection.  AR 258.

7  On January 23, 2007, Plaintiff saw Dr. Yoshimura and reported that she did better after

8  the October 2006 injection.  She was off all medications except for Paxil, Soma and Maxalt and

9  her headaches were increasing as she was tapering off Paxil.  On examination, she had full

10  cervical range of motion.  Strength and gait were okay.  Plaintiff received a Myobloc injection.

11  AR 255.

12  Plaintiff saw Dr. Yoshimura on May 9, 2007, and he instructed her to taper off Paxil.  He

13  noted that her headaches were worse as she tapered off the medication.  Plaintiff received a

14  Myobloc injection.  AR 333-334.

15  On June 21, 2007, State Agency physician P.F. Frye, M.D., completed a Physical

16  Residual Functional Capacity Assessment.  Dr. Frye opined that Plaintiff could occasionally

17  lift/carry 10 pounds, less than 10 pounds frequently.  She could stand and/or walk for at least 2

18  hours in an 8 hour day and could sit for less than 6 hours in an 8 hour day.  Plaintiff had to

19  periodically alternate  sitting and standing to avoid cervical spasm, possibly as much as every 15

20  minutes.  Plaintiff could only occasionally push/pull with her upper extremities.  She could

21  occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds.  Plaintiff

22  could frequently balance and occasionally stoop, kneel, crouch and crawl.  She could perform

23  occasional overhead reaching and had to avoid concentrated exposure to extreme heat and cold.

24  Dr. Frye found that with Plaintiff's "marked positional problems causing tension HA's, she

25  would have to be able to s/s/w alternating frequency," and would therefore be able to perform

26  less than sedentary work.  AR 288-292, 295.

27

28

Plaintiff received another Myobloc injection on August 29, 2007.  She reported that she had 57 headaches over the last 3 months.  Dr. Yoshimura noted that her headaches were worse off all prophylactic treatment.  Dr. Yoshimura also started Plaintiff on Neurontin.  AR 309.

On September 10, 2007, Plaintiff saw Robert Gonzales, M.D., and complained of neck pain leading to headaches after a recent car accident.  She also complained of low back pain with numbness and tingling in the back of her legs.  Plaintiff was taking Advil for pain, but stopped after stomach upset.  She was continuing to take Tylenol for pain and Maxalt for migraine headaches, which she reported increased after the accident.  On examination, she had tenderness along the paraspinous area in her upper neck and at the base of her skull.  She also had paraspinous muscle tenderness and mild rhomboid tenderness in her upper back, and tenderness over the spinous processes, with paraspinous tenderness over the L3-L5 region, in her lower back.  Range of motion in her lower back was decreased, but gait was normal and muscle strength was good throughout.  Plaintiff had decreased sensation in the lateral left lower leg and foot, but sensation was otherwise intact.  Dr. Gonzales diagnosed chronic neck pain related to a recent car accident, low back pain with bony tenderness and migraine headaches.  She was instructed to continue with over the counter pain medications.  AR 307-308.

On September 11, 2007, Dr. Yoshimura completed a questionnaire in which he opined that Plaintiff was precluded from performing full-time work at any level due to refractory migraine headaches.  He noted that Plaintiff's symptoms were all subjective, and included headaches, nausea and photophobia.  Her symptoms were variable and for a majority of days (4 days per week), she is incapacitated and unable to sit, stand or walk for any prolonged period.  He believed that she has been limited in this capacity since 2004.  Dr. Yoshimura also noted that she had symptoms suggestive of upper cervical nerve root irritation pursuant to Listing 1.04A.  AR 297.  A September 13, 2007, x-ray of Plaintiff's lumbar spine showed some degenerative changes and mild scoliosis to the right.  AR 303.  X-rays of her cervical spine showed narrowing and right sided neural foramina encroachment mainly at C5-6.  AR 304.

On November 21, 2007, State Agency physician Lavanya V. Bobba, M.D., completed a Physical Residual Functional Capacity Assessment.  Dr. Bobba opined that Plaintiff could

occasionally lift/carry 10 pounds, less than 10 pounds frequently.  She could stand and/or walk for at least 2 hours in an 8 hour day and could sit for about 6 hours in an 8 hour day.  She could occasionally climb ramps, stairs, ladders, ropes or scaffolds.  Plaintiff could occasionally balance, stoop, kneel, crouch and crawl.  Plaintiff could perform occasional overhead reaching and had to avoid concentrated exposure to extreme heat, extreme cold and hazards.  AR 315-319.

Plaintiff returned to Dr. Yoshimura on December 12, 2007, and reported that she was off all medications except for Paxil, Soma and Maxalt.  She has had a mild increase in headaches with the weather change.  He gave her a Myobloc injection.  AR 332.

On March 17, 2008, Plaintiff told Dr. Yoshimura that her migraines were increasing with the weather change and that she felt nauseated.  He gave her a Myobloc injection and a medication for nausea.  AR 332.

Plaintiff saw Dr. Yoshimura on July 2, 2008.  She reported that she was better overall, but continued to have frequent headaches.  Plaintiff wanted to try Topamax.  On examination, she had full range of motion in her cervical spine.  He diagnosed chronic mixed headaches, stable, and gave her another Myobloc injection.  AR 330.

On December 13, 2008, State Agency physician J. Mitchell, M.D., reviewed the medical record.  Dr. Mitchell noted that despite Dr. Yoshimura's description, there was no evidence of nausea or photophobia in the medical evidence.  Dr. Mitchell believed that the evidence supported chronic cervical strain with headaches, rather than migraines.  Dr. Mitchell opined that a sedentary residual functional capacity ("RFC") with postural limitations, limited shoulder reaching and frequent shifts in position, was appropriate.  AR 323-327.

On April 7, 2009, Dr. Yoshimura completed another questionnaire.  He explained that Plaintiff's severe migraine headaches preclude her from any work during her headaches, which can occur "up to daily."  As objective findings, he noted that he has directly observed Plaintiff during her times of severe headaches.  He could not comment on any physical limitations other than at times of her severe headaches, when she could not perform any work.  Dr. Yoshimura stated that he has followed Plaintiff for headaches since 1994.  AR 344.

1    <u>ALJ's Findings</u>

2    The ALJ determined that Plaintiff had the severe impairments of migraine/mixed

3    headaches, degenerative changes at multiple levels of the cervical spine with foraminal

4    encroachment and posterolisthesis at C5-6 and osteoporosis in her lumbar spine.  AR 9-10.

5    Despite these impairments, the ALJ determined that Plaintiff retained the RFC to lift and carry

6    10 pounds occasionally, up to 10 pounds frequently, and sit, stand and walk for 6 hours in an 8

7    hour day, subject to a sit/stand option at will.  Plaintiff could occasionally reach above shoulder

8    level, balance, stoop, kneel, crouch and crawl.  AR 10.  With this RFC, the ALJ determined that

9    Plaintiff could perform her past relevant work as an office manager, automobile speciality.  AR

10   14.

11   **SCOPE OF REVIEW**

12   Congress has provided a limited scope of judicial review of the Commissioner's decision

13   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

14   the Court must determine whether the decision of the Commissioner is supported by substantial

15   evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

16   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

17   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

18   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

19   401.  The record as a whole must be considered, weighing both the evidence that supports and

20   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

21   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

22   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

23   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

24   Secretary applied the proper legal standards, and if the Commissioner's findings are supported

25   by substantial evidence.  *See* *Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510

26   (9th Cir. 1987).

27

28

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" (migraine/mixed headaches, degenerative changes at multiple levels of the cervical spine with foraminal encroachment and posterolisthesis at C5-6 and osteoporosis in her lumbar spine) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; but (4) can perform her past relevant work. AR 9-15.

Here, Plaintiff argues that the ALJ (1) erred in finding that Plaintiff could perform her past relevant work; (2) improperly rejected the opinion of the State Agency physicians; (3) improperly rejected the opinion of her treating physician, Dr. Yoshimura; (4) improperly rejected her allegations; and (5) improperly rejected the testimony of her husband, Seth Stairs.

**DISCUSSION**

A.    Plaintiff's Past Relevant Work

Plaintiff first argues that the ALJ erred in finding that she could perform her past relevant work because her past work did not allow for a sit/stand option.

At step four, claimants have the burden of showing that they can no longer perform their past relevant work, as actually performed or as generally performed. 20 C.F.R. §§ 404.1520(f), 404.1560(b)(2); *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001). Although the burden lies with the claimant, the ALJ must make the requisite factual findings to support his conclusion. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." SSR 82-62.

Here, Plaintiff's RFC allowed for sitting, standing and walking for 6 hours each and required a "sit/stand option at will." AR 10. The hypothetical that the ALJ ultimately adopted asked the VE to assume that the individual could "stand and walk six hours" and "sit six hours with the, with the option to change positions as needed." AR 43. In response, the VE testified that this person could perform Plaintiff's past work *as actually performed.* AR 44. The VE explained that even though the position is classified as light in the amount of weight generally lifted, Plaintiff testified that she did not lift over 10 pounds. AR 43-44. In other words, Plaintiff's lifting RFC precluded performance of her past work as generally performed, but not as Plaintiff actually performed it.

Plaintiff argues that substantial evidence does not support a finding that her prior position allowed her an "option to change positions as needed," or a sit/stand option. A claimant's testimony or properly completed vocational report can define past work as actually performed. *Pinto*, 249 F.3d at 845, SSR 82-41; SSR 82-61. During the hearing, she explained:

> I would, basically I was standing and sometimes - basically I would like walk about and talk, you know, to the customers and then go over and talk to the, the bookkeeper and see that she was doing the right thing. I would sit down maybe and do a little entry into my laptop maybe for about half an hour.

AR 24. In her disability report, Plaintiff indicated that she reviewed billing statements, instructed the secretary to do paperwork, evaluated insurance policies, had safety meetings with employees, and answered the telephone. She said that she was "a boss" so she did "a lot of instructing people what to do." Plaintiff worked 5 hours per day, during which she stated that she sat for 2 hours, walked for 2 hours and stood for 1 hour. AR 128.

While it is certainly conceivable that a person in a management position can alter their tasks to provide for a sit/stand option, neither the VE nor the ALJ confirmed that this was the case.  The ALJ therefore failed to make the requisite factual findings to support his conclusion that Plaintiff could return to her past relevant work.  Defendant suggests that it was within the VE's expertise to determine that Plaintiff had a sit/stand option, yet the VE's expertise does not exist in a vacuum.  The VE needs the necessary facts from which to make occupational determinations and here, those facts were absent.

Remand will be discussed at the end of this opinion.

B.      ALJ's Analysis of Physicians' Opinions

Plaintiff argues that the ALJ failed to give valid reasons for rejecting Dr. Yoshimura's opinion and improperly rejected the standing/walking limitations set forth by three State Agency physicians.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987).  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991).  Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).  As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506. And like the opinion

13

of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians...." *Magallanes*, 881 F.2d at 752 (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

The opinion evidence consists of opinions from Plaintiff's treating source, Dr. Yoshimura, and three State Agency physicians. Dr. Yoshimura provided two questionnaires indicating that Plaintiff was incapable of even sedentary work. The three State Agency physicians, Drs. Frye, Bobba and Mitchell, found Plaintiff capable of sedentary work.

The ALJ's RFC, however, found Plaintiff capable of light work. He therefore rejected *all* of the standing/walking opinions.

1.    *Dr. Yoshimura*

On both occasions, Dr. Yoshimura explained that Plaintiff was not capable of gainful employment because of her headaches. In September 2007, he noted that she could not sit, stand or walk for any prolonged period. In April 2009, he stated that he could not comment on her physical abilities except during times when she had a headache and could not perform any activity. AR 297, 344.

1    The ALJ rejected Dr. Yoshimura's opinions in favor of the three State Agency

2    physicians' opinions.  He first suggests that Dr. Yoshimura was not "entirely candid" in his

3    reports because he fails to mention the "highly probative fact" that "Plaintiff was less than

4    willing to take headache prophylactic medications which improve her symptoms."  AR 12.

5        A review of the record indicates that Plaintiff often started and stopped various

6    medications.  It does not necessarily support a finding, however, that Plaintiff was non-compliant

7    to the point of "seriously undermin[ing]" Dr. Yoshimura's credibility.  AR 12.  In fact, in most

8    instances, Plaintiff stopped taking a medication because of side effects.  For example, Plaintiff

9    stopped taking Topamax because of mood changes, hair loss, "? effect on bones" and diarrhea.

10   AR 214, 261.  Despite these effects, Plaintiff eventually asked to try Topamax again, a request

11   that cuts against a finding that Plaintiff was simply not compliant.  AR 330.  Similarly, she

12   stopped taking Depakote because of weight gain and gastrointestinal upset.  AR 261.  Certainly,

13   the reasons why a patient discontinues a medication must factor in to the ALJ's analysis.  In

14   recognition of this, the Ninth Circuit has held that only *unexplained* or *inadequately explained*

15   failure to follow treatment can be cited in discrediting subjective testimony.  *Smolen v. Chater,*

16   *80 F.3d 1273, 1284 (9th Cir. 1996)* (emphasis added).

17       As for the notations regarding Neurontin, it does appear that Plaintiff did not begin taking

18   it when instructed, though there is no explanation as to why.  Even assuming that this is an

19   instance of non-compliance, there is no evidence that Neurontin improved her symptoms.  Nor is

20   it substantial evidence from which to suggest that Dr. Yoshimura was intentionally being

21   untruthful in his reports.

22       Based on this record, then, the ALJ cannot state that "it is apparent that he was not being

23   entirely candid in his reports" because "his records clearly detail the fact" of non-compliance.

24   AR 12.  The ALJ's conclusion is simply not supported by substantial evidence in the record.

25       The ALJ next rejects Dr. Yoshimura's opinions because he characterizes them as

26   "internally inconsistent."  The ALJ describes Dr. Yoshimura's first report as stating that

27   Plaintiff's cervical impairment "met Listing 1.04A."  AR 12.  He then contrasts this with his

28   second report, in which he stated that he could not offer opinions beyond those associated with

1   Plaintiff's headaches. AR 12. He concludes, "the fact that his earlier report specifically stated

2   that her neck impairments were listing level, raises serious concerns regarding the thoughtfulness

3   and care he used in reaching his opinions." AR 12.

4          As Plaintiff contends, however, the ALJ misstates Dr. Yoshimura's opinion. He does not

5   conclude that Plaintiff's cervical impairments meet Listing 1.04A, but rather states that

6   Plaintiff's symptoms were "*suggestive* of upper cervic[al] nerve root irritation." AR 297

7   (emphasis added). Second, Dr. Yoshimura was responding specifically to a question that stated,

8   "Do you feel claimant meets Listing 1.04A (see attached)?" AR 297. There was no such

9   question on the second questionnaire, making it questionable to fault Dr. Yoshimura for not

10  being consistent. AR 344.

11         Finally, the limitations set forth in both of Dr. Yoshimura's reports were based solely on

12  Plaintiff's headaches. AR 297, 334. His opinions both times were consistent- during a headache

13  episode, Plaintiff could not sit, stand or walk for prolonged periods of time.

14         As his final reason for rejecting Dr. Yoshimura's opinions, the ALJ explains that Dr.

15  Yoshimura "claims that the claimant has nausea and photophobia," yet State Agency physician

16  Dr. Mitchell found that neither symptom was found in the treatment notes. AR 12. The ALJ

17  acknowledges that a complaint of nausea appears after Dr. Yoshimura's September 2007

18  opinion, but states that it only appears once. He concludes that the symptoms allegedly

19  supporting Dr. Yoshimura's findings "find little substantial medical support." AR 12.

20         While it is true that Dr. Yoshimura's notes prior to September 2007 did not include

21  complaints of nausea or photophobia, the fact that there is a complaint of nausea in March 2008

22  for which Plaintiff received medication weakens the ALJ's conclusion. In any event, having

23  found that the ALJ's other reasons for rejecting Dr. Yoshimura's opinions were not supported by

24  substantial evidence, the ALJ cannot rely on this questionable basis alone in concluding that Dr.

25  Yoshimura's reports "lack basic indicia of reliability." AR 12.

26         Insofar as Defendant suggests that Dr. Yoshimura's April 2009 report lacks support

27  because he last saw Plaintiff in July 2008 and noted that she was stable at her last few visits, the

28  ALJ did not rely on these facts in rejecting Dr. Yoshimura's opinions. The Court will not

entertain a post hoc rationale.  A reviewing court cannot affirm an ALJ's decision denying benefits on a ground not invoked by the Commissioner.  *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006).

In his analysis, the ALJ makes strong allegations against Dr. Yoshimura, i.e, that he was untruthful, and that his opinions lack basic indicia of reliability and raise "serious concerns regarding the thoughtfulness and care he used in reaching his opinions."  AR 12.  Any rational reading of the medical evidence, however, does not support such drastic statements.  Dr. Yoshimura treated Plaintiff for years and his opinions cannot be dismissed with exaggerated and unsupported conclusions.

2. *State Agency Physicians' Opinions*

In rejecting Dr. Yoshimura's opinions, the ALJ adopted a majority of the findings of the three State Agency physicians.  He did not, however, adopt their opinion that Plaintiff could stand and walk less than 6 hours per day.  She argues that if the ALJ had adopted these limitations, Plaintiff could not have performed her past relevant work and would have been found disabled at step five pursuant to the Medical-Vocational Guidelines.

The ALJ's RFC finding as to standing and walking rejects *all* medical opinions in favor of his opinion based on his interpretation of the medical evidence.  Although the ultimate RFC determination is reserved for the Commissioner, it must nonetheless be supported by substantial evidence.  20 C.F.R. § 404.1527(e)(2).  When an ALJ rejects all medical opinions in favor of his own, a finding that the RFC is supported by substantial evidence is less likely.

Indeed, the ALJ's conclusion that Plaintiff's capacity for standing and walking was greater than that set forth by the medical sources was based solely on his conclusion that "there is simply a lack of objective medical evidence indicating that Plaintiff has significant difficulty ambulating or has symptoms which would cause such limitations."  AR 10.  The ALJ acknowledged that (1) Plaintiff's MRI revealed degenerative changes at multiple levels in the cervical spine with foraminal encroachment and posterolisthesis; (2) Plaintiff showed symptoms of nerve root or spinal cord involvement in June 2006; and (3) Plaintiff had reduced cervical range of motion in April 2006 and tenderness and pain in September 2007.  AR 12.  He

1   concluded, however, that these positive findings were the exception rather than the rule.  AR 12.

2   He also found no clinical evidence of related motor, sensory or reflex loss or other signs of

3   neurological involvement.  AR 13.

4       Based on this analysis, the ALJ concluded that "there is little here to indicate that this

5   impairment would preclude Plaintiff from performing a range of sedentary work."  AR 13.  This

6   conclusion ignores, however, Plaintiff's constant complaints of neck and back pain and the

7   objective findings.  AR 207, 209, 211, 218, 221, 239-240, 264, 304, 307-308.  It also represents

8   the ALJ's own interpretation of the medical findings.

9       Not only has the ALJ improperly substituted his own lay opinion of the medical evidence

10   in place of that of four medical experts, but he has misstated the end result.  *Gonzalez Perez v.*

11   *Sec'y Health & Human Serv.*, 812 F.2d 747, 749.  The ALJ states that Plaintiff would not be

12   precluded from performing sedentary work, yet his finding that Plaintiff can stand and walk for 6

13   hours each places Plaintiff at a *light* RFC.  SSR 83-10.

14       The ALJ's lay interpretation also ignores the fact that the stand and walk opinions are

15   based on a combination of Plaintiff's neck/back pain and her headaches.  AR 289, 295, 297, 327,

16   344.

17       Accordingly, in light of the consensus of medical opinions that Plaintiff cannot stand and

18   walk for six hours each, the ALJ's interpretation of the medical evidence is not supported by

19   substantial evidence.  Remand will be discussed at the end of this opinion.

20   C.   Plaintiff's Credibility

21       Plaintiff next argues that the ALJ improperly assessed her credibility.

22       In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the

23   pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's

24   subjective complaints:

25       An ALJ is not "required to believe every allegation of disabling pain" or other
       non-exertional impairment.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989).
26       However, to discredit a claimant's testimony when a medical impairment has been
       established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan*,
27       169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why
       the [claimant's] testimony is unpersuasive." *Id.*  Where, as here, the ALJ did not find

28

"affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing."  *Id.*

Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel,* 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand).  Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment."  *Fair,* 885 F.2d at 603; *see also Thomas,* 278 F.3d at 958-59.

The ALJ begins his credibility analysis by repeating his conclusion that Plaintiff did not take her medications "which she herself admits improved her symptoms."  AR 11.  The Court has addressed this above in reviewing the ALJ's treatment of Dr. Yoshimura's opinions.  The ALJ cites Plaintiff's complaints about side effects, but for unclear reasons, he doubts Plaintiff's reports.  For example, he states that Plaintiff "*claimed* 'concerns'" about mood swings, etc., and "*claimed*" weight gain and diarrhea.  AR 11 (emphasis added).  Insofar as the ALJ bases his doubt on Dr. Yoshimura's notations of "?" reasons, his use of "?" doesn't necessarily support a conclusion that Dr. Yoshimura found Plaintiff's complaints questionable.  Instead, his use of a question mark appears to be more consistent with a meaning of "unknown."  There is nothing else in Dr. Yoshimura's treatment notes to suggest that Plaintiff's complaints are unfounded.

The record is also not clear that her medications improved her symptoms or that the benefits outweighed the side effects.  The ALJ states that Dr. Yoshimura's records indicate that her symptoms were improved when she took Topamax and that her symptoms were worse when she wasn't taking prophylactic medications.  AR 11.  Although Plaintiff initially reported that Topamax helped, Dr. Yoshimura noted that her headaches were not any different off Topamax.  AR 273, 214.  He later noted that her headaches were worse when she was off all prophylactic medications, though it was not clear that Plaintiff was being non-compliant with her medications.  Again, based on Plaintiff's reports of side effects and the uncertainty of whether various medications actually improved her symptoms, substantial evidence does not support the

1    ALJ's conclusion that Plaintiff's medications helped her symptoms and that she stopped taking

2    her medications for questionable reasons.  The ALJ's statement that it is "common sense" that

3    one suffering from severe headaches would not stop taking "medications which provide

4    substantial relief simply because of diarrhea, weight gain, an upset stomach, etc." is therefore

5    unjustifiable.  AR 12.

6         The ALJ next highlights what he characterizes as a "positive Waddell sign, indicative of

7    feigned or exaggerated symptoms."  AR 14.  In June 2006, Dr. Quinn examined Plaintiff and

8    noted, "Waddell Signs Generalization" and "intermittent but intense eye contact."  AR 264.

9         Even assuming that positive Waddell signs evidence malingering, an issue on which

10   courts within the Ninth Circuit do not agree, Dr. Quinn's unspecific notation does not support a

11   finding that Plaintiff showed positive Waddell signs.  The Waddell test establishes 5 "signs" of

12   nonorganic sources of pain and does not distinguish between malingering and psychological

13   conditions.  If more than 3 of the 5 signs are positive, then there is a high probability that the

14   patient has nonorganic pain.  *See* Gordon Waddell et al., Nonorganic Physical Signs in

15   Low-Back Pain, 5 Spine 117, 117-25 (Mar.-Apr.1980).  Here, Dr. Quinn did not indicate how

16   many positive Waddell signs Plaintiff exhibited, if any.  It is unclear exactly what "Waddell

17   Signs Generalization" means and Dr. Quinn does not state anywhere in his report that he thinks

18   Plaintiff may be exaggerating her symptoms in any way.  As with much of the other evidence in

19   this action, the ALJ has taken an unsupported leap in concluding that Plaintiff exhibited a

20   positive Waddell sign indicative of malingering.[2]

21        Finally,[3] the ALJ discredits Plaintiff because she "once sought treatment because she had

22   fallen chasing after a mouse, which is clearly not behavior consistent with an individual alleging

23   chronic neck and low back pain..."  AR 14.  The ALJ may use "ordinary techniques" in

24   addressing credibility.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may

25

26        [2] Defendant does not address this issue.

27        [3] Defendant contends that the ALJ also relied on the conservative treatment that Plaintiff received for her
     neck and back pain in questioning her credibility.  However, Plaintiff's treatment was discussed in analyzing
28   Plaintiff's RFC and the Court will not assume that it was a factor in the ALJ's credibility analysis.

make inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996). Certainly, the ALJ can question the credibility of a claimant who alleges severe pain yet performs activities beyond those that would be expected. The ALJ's conclusion would be better supported, however, if Plaintiff hadn't failed in her attempt by falling and exacerbating her back pain. In any event, given the ALJ's improper conclusions on the other credibility factors, Plaintiff's mouse chasing would hardly constitute substantial evidence to discredit her testimony.

Accordingly, the Court finds that the ALJ's credibility determination was not supported by substantial evidence.

D.     Lay Witness Testimony

Finally, Plaintiff contends that the ALJ's rationale for rejecting her husband's testimony was not sufficient.

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Bruce v. Astrue,* 557 F.3d 1113 (9th Cir. 2009) (*citing* *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir.2006)). Such testimony is competent evidence and " cannot be disregarded without comment." *Id.* (*citing* *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996)). If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons "that are germane to each witness." *Id.* Further, the reasons "germane to each witness" must be specific. *Stout,* 454 F.3d at 1054.

The ALJ found that there was little in Mr. Stairs' report to indicate that Plaintiff is unable to perform a range of sedentary exertion. First, he noted that Mr. Stairs reported that Plaintiff "continues to maintain their home, doing household chores, taking care of pets and shopping." AR 14. The ALJ acknowledges that Mr. Stairs said that Plaintiff needs to rest "after 20 minutes, or so, of performing household chores," but states that there is no indication that Plaintiff performed the chores "at a sedentary level," or "while alternating standing and sitting, at will." AR 14.

The ALJ's conclusions about Plaintiff's activities derived from Mr. Stairs' report are overstated. Although the ALJ stated that Plaintiff "continues to maintain their home" and perform household chores, Mr. Stairs actually stated that Plaintiff dusts, does laundry once or

twice per week and waters outside plants.  AR 165.  She can only do these tasks for 15-20 minutes per chore" before needing to rest.  AR 165.  Although the ALJ stated that Plaintiff takes care of pets, Mr. Stairs stated that she performs "partial care for dogs/cats."  AR 164.  Although the ALJ stated that Plaintiff continues to perform the shopping, Mr. Stairs indicated that Plaintiff shops once per week for 30 minutes.  AR 166.  The ALJ's interpretation of Mr. Stairs' descriptions is therefore incorrect.

Moreover, the ALJ uses his incorrect characterization to support his purported finding that Plaintiff can perform sedentary work.  As discussed throughout this opinion, however, the ALJ found an RFC for *light* work.

The ALJ next states that Mr. Stairs opines that Plaintiff has "significant mental limitations which, if credible, would likely preclude her from performing semiskilled or skilled work."  AR 14.  He rejects Mr. Stairs' opinions based on a lack of "medical or psychiatric evidence supporting the presence of any significant psychiatric symptoms or mental limitations."  AR 14.  Indeed, A mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  A claimant's own statement of symptoms is not sufficient to establish a mental impairment.  20 C.F.R. § 416.908.  Other than Mr. Stairs' statements and Plaintiff's statements that she cannot concentrate for more than 5 minutes and has difficulty remembering, there is nothing in the medical record to suggest a mental impairment.

Of the two reasons given to discredit Mr. Stairs, one was not substantially supported by the record.  As the Court is remanding on numerous other grounds, it will remand on this ground, as well.

E.    Remand

Section 405(g) of Title 42 of the United States Code provides: "the court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  In social security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

1 administrative proceedings, a social security case should be remanded.  Where, however, a

2 rehearing would simply delay receipt of benefits, reversal and an award of benefits is

3 appropriate." *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

4 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

5 useful purpose would be served by further administrative proceedings, or where the record has

6 been thoroughly developed.").

7          Given the nature of the errors and the uncertainty of the ultimate determinations, the

8 Court cannot conclude that the record is thoroughly developed to support a decision by this

9 Court.  First, although the Court concluded that the ALJ incorrectly analyzed the medical

10 opinions, there remain slight differences in the State Agency physicians' opinions to prevent the

11 Court from determining which should have been adopted.  For example, Dr. Frye actually finds a

12 less than sedentary RFC and Dr. Bobba does not find a sit/stand option.  Dr. Mitchell agrees with

13 Dr. Bobba but requires the ability to shift positions.

14          This also prevents the Court form formulating an RFC, which in turn prevents a step four

15 or five analysis.

16          Accordingly, the Court finds that REMAND for FURTHER PROCEEDINGS is

17 necessary to fully develop the record and make the requisite findings.  On remand, the ALJ must

18 (1) gather sufficient facts about the sitting and standing requirements of Plaintiff's past relevant

19 work; (2) analyze the medical evidence and the testimony of Plaintiff and Mr. Stairs; (3)

20 formulate a supported RFC; and (4) make a determination at step four, or step five, if necessary.

21                                          **CONCLUSION**

22          Based on the foregoing, the Court finds that the ALJ's decision is not supported by

23 substantial evidence and is therefore REVERSED.  The case is REMANDED to the ALJ for

24 further proceedings consistent with this opinion.  The Clerk of the Court is DIRECTED to enter

25 judgment in favor of Ruth Stairs and against Defendant Michael J. Astrue.

26          IT IS SO ORDERED.

27    **Dated:   January 31, 2011**          **/s/ Dennis L. Beck**
                                          UNITED STATES MAGISTRATE JUDGE
28

23